UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SEVERIN HEGEL, et al.,

      Plaintiffs,

v.                         CASE NO.  8:12-CV-1161-T-17MAP

THE FIRST LIBERTY
INSURANCE CORPORATION,

      Defendant.

_____/

ORDER

This cause is before the Court on:

Dkt. 29    Motion for Summary Judgment
Dkt. 30    Response

This case was removed from Hernando County Circuit Court on May 23, 2012. The Amended Complaint (Dkt. 25) includes Plaintiffs' breach of contract claim.   The basis of jurisdiction is diversity.

Defendant The First Liberty Insurance Corporation ("First Liberty") filed a Counterclaim for Declaratory Judgment (Dkt. 26, pp. 9-13).  Defendant moves for entry of summary judgment on the Counterclaim.

I. Standard of Review

A.  Fed. R. Civ. P. 56

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

Case No. 8:12-CV-1161-T-17MAP

any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

> The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination of which facts are material and which facts are...irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson, 477 U.S. at 248. But, "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." Id. at 249-50.

B.  Principles of Insurance Contract Interpretation

It is undisputed that Florida law governs the interpretation of the insurance policy at issue.   The Court looks first to the decisions of the Florida Supreme Court, and, in the absence of definitive guidance, follows relevant decisions of Florida's intermediate appellate courts.  State Farm Fire and Cas. Co. v. Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004).

Under Florida law, insurance contract interpretation is a matter of law, and such "contracts are construed in accordance with the plain language of the policy as bargained for by the parties." Fayad v. Clarendon Nat'l Ins. Co., 889 So.2d 1082, 1086

Case No. 8:12-CV-1161-T-17MAP

(Fla. 2005)(internal quotation marks and alteration omitted).

In interpreting an insurance contract, courts are bound by the plain meaning of the contract's text; if the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written. State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So.3d 566 (Fla. 2011).   Where the language in a policy is plain and unambiguous, there is no special construction or interpretation required, and the plain language in the contract is to be given the meaning which it clearly expresses. Jefferson Ins. Co. of N.Y. v. Sea World of Fla., Inc., 586 So.2d 95, 97 (Fla. 5th DCA 1991).  The fact that the policy does not provide definitions of certain terms does not automatically render the terms ambiguous. Jefferson Ins. Co., 586 So.2d at 97 (citing Travelers Ins. Co. v. C.J. Gayfer's & Co., Inc., 366 So.2d 1199, 1201 (Fla. 1st DCA 1979)).  When interpreting insurance contracts, a court may consult references commonly relied on to supply the accepted meanings of words. Garcia v. Federal Ins. Co., 969 So.2d 288, 291 (Fla. 2007)(citing Govt. Employees Ins. Co. v. Novak, 453 So.2d 1116, 1118 (Fla. 1984)).

However, "[i]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage, and the [other] limiting coverage, the insurance policy is considered ambiguous." Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000).  "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." Id. "Likewise, ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured." Id. "[E]xclusionary clauses are construed even more strictly against the insurer than coverage clauses." Id. (citations omitted). "[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." Id.; see also Sec. 627.419(1), Florida Statutes. ("Every insurance policy shall be construed according to the entirety of its terms and

3

Case No. 8:12-CV-1161-T-17MAP

conditions...") "[A]ny apparent inconsistency should be reconciled if possible." <u>Florida Farm Bureau Ins. Co. v. Birge</u>, 659 So.2d 310, 312 (Fla. 2d DCA 1991).

C. Principles of Statutory Construction

Legislative intent is the polestar that guides the interpretation and construction of a statute. <u>See</u> <u>E.A.R. v. State</u>, 4 So.3d 614, 629 (Fla. 2009). A court primarily discerns legislative intent by looking to the plain text of the relevant statute. <u>See</u> <u>id.</u> A court gives a statute its plain meaning when the language of the statute is clear and unambiguous and conveys a definite meaning. <u>See</u> <u>Maddox v. State</u>, 923 So.2d 442, 450 (Fla. 2006). When the meaning of a statute is ambiguous, a court may turn to the rules of statutory interpretation and construction. <u>See</u> <u>E.A.R.</u>, 4 So.3d at 629

One rule of statutory construction is the doctrine of <u>in pari materia</u>. <u>See</u> <u>id.</u> This principle requires courts to construe statutes that relate to the same subject matter together to harmonize those statutes and give effect to legislative intent. <u>See</u> <u>id.</u> Similarly, a statute is to be read as a consistent whole, and a court should accord meaning and harmony to all of its parts, with effect given to every clause and related provision. <u>See</u> <u>Larimore v. State</u>, 2 So.3d 101, 106 (Fla. 2008).

II. Statement of Facts

The Case Management Order included the Court's instructions as to procedures for a Statement of Undisputed Facts. The docket does not show any sign that either party complied with those procedures. The Court has attached Counterclaim Plaintiff's and Counterclaim Defendants' statements of fact to this Order. To the extent that a party's Statement of Facts includes legal conclusions, the Court ignores those conclusions.

Case No. 8:12-CV-1161-T-17MAP

III. Discussion

In the Counterclaim, Counterclaim Plaintiff First Liberty seeks a declaration that the following coverage provision provides no coverage for the damage claimed by Plaintiffs/Counterclaim Defendants Severin and Stephanie Hegel to their real property located at 8257 Tranquil Drive, Spring Hill, Hernando County, Florida, unless that loss includes structural damage, and that the term "structural damage" includes, at a minimum, damage that impairs the structural integrity of the building:

SECTION I - PERILS INSURED AGAINST

The following perils are added:

Sinkhole Loss

a. Sinkhole Loss means structural damage to the building, including the foundation, caused by sinkhole activity. Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity.

(1) We will pay to stabilize the land and building and repair the foundation in accordance with the recommendations of a professional engineer and in consultation with you.

b. Sinkhole Activity means settlement or systematic weakening of the earth supporting such property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

The SECTION I - Earth Movement exclusion does not apply to this peril.

(Dkt. 29-1, p. 40).

Case No. 8:12-CV-1161-T-17MAP

A.  Presence of Genuine Issue as to Material Fact

Defendant/Counterclaim Plaintiff First Liberty argues that the only issue to be determined by the Court is one of law, and there are no genuine issues as to any material facts.

Plaintiffs/Counterclaim Defendants argue that there are genuine issues of material fact as to whether sinkhole activity is present at the subject property, whether sinkhole activity is the cause of the damages and distress, and what the appropriate method of repair is.

The construction of an insurance policy is a question of law for the Court.  It is for the jury to determine whether the facts of the case fall within the scope of coverage as defined by the Court.  State Farm Fire & Casualty Co. v. Lichtman, 227 So.2d 309, 311 (Fla. 3d DCA 1969)(Whether a certain set of facts exists to bring loss to insured within terms of policy is to be determined by the trier of fact).

The only issue on which Defendant/Counterclaim Plaintiff First Liberty seeks entry of summary judgment is an issue of contract interpretation, which is a question of law for the Court.

B.  Policy No. H36-258-068174-4008

There are no genuine issues of material fact as to the content or execution of Policy No. H36-258-068174-4008, the policy covering 8527 Tranquil Dr., Spring Hill, FL. The policy period is 10/5/2010 to 10/5/2011.  The policy was countersigned on 9/2/2010.  (Dkt. 29-1, pp. 1-4).

Case No. 8:12-CV-1161-T-17MAP

It is undisputed that on August 12, 2011, Plaintiffs/Counterclaim Defendants made a claim for damage to the property discovered on August 12, 2011. Defendant/Counterclaim Plaintiff First Liberty retained Structural Engineering and Inspections, Inc. ("SEI"), who conducted a structural evaluation of the subject property, and produced a report dated September 23, 2011, in which SEI opined that the subject property did not meet the criteria for structural damage as defined in Florida Statute 627.706 (SB 408).  Defendant/Counterclaim Plaintiff determined that the policy provided no coverage for Plaintiffs' claim, and denied the claim.

C.  The 2011 Amendment to Florida Statute 627.706

The Florida Legislature has not changed the definition of "sinkhole loss" since 2005, but enacted a new, technical definition for "structural damage" that went into effect on May 17, 2011.  See 2011 Fla. Sess. Law Serv. Ch. 2011-39, Sec. 22.  As a result of the 2011 amendments, the following definition is included in the Florida Insurance Code:

> (k) "Structural damage" means a covered building, regardless of the date of its construction, has experienced the following:
>
> 1. Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement-related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code;
>
> 2. Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement-related damage to the primary structural members or primary structural systems that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those primary structural members or primary structural systems exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar

Case No. 8:12-CV-1161-T-17MAP

structure, purpose, or location;

3. Damage that results in listing, leaning, or buckling of the exterior load-bearing walls or other vertical primary structural members to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

4. Damage that results in the building, or any portion of the building containing primary structural members or primary structural systems, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

5. Damage occurring on or after October 15, 2005, that qualifies as "substantial structural damage" as defined in the Florida Building Code.

D.  Meaning of "Structural Damage"

Defendant/Counterclaim Plaintiff argues that the Legislature's replacement of the term "actual physical damage" with the term "structural damage" within the definition of "sinkhole loss" in the 2005 amendments to F.S. 627.706, and the 2007 amendment  is determinative.  Defendant/Counterclaim Plaintiff argues that the replacement was a purposeful, substantive change to the threshold damage requirement contained in the sinkhole statute.  Defendant/Counterclaim Plaintiff further argues that the 2011 Amendments are a further refinement of that substantive change. Defendant/Counterclaim Plaintiff argues that the new definition of "structural damage" should retroactively be made a part of the Policy at issue as a clarification of a prior substantive change in Florida law.

The term "structural damage" is not defined in the applicable insurance policy.  A term in an insurance policy is not necessarily considered ambiguous because the term is not defined in the policy.  Under Florida law, the Court should construe the undefined

Case No. 8:12-CV-1161-T-17MAP

word or phrase according to the meaning a person of ordinary intelligence would reasonably give it.  Pacific Employers Ins. Co. v. Wausau Business Ins. Co., 508 F.Supp.2d 1167, 1174 (M.D. Fla. 2007).  See also Dahl-Eimers v. Mutual of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993)("[t]he insurer cannot, by failing to define the terms....or to include any additional qualifying or exclusionary language, insist upon a narrow, restrictive interpretation of the coverage provided.")

Defendant/Counterclaim Plaintiff First Liberty and Plaintiffs/Counterclaim Defendants agree that the term "structural damage" should be given its ordinary and plain meaning.   According to Defendant/Counterclaim Plaintiff First Liberty, the term "structural damage" means, at a minimum, its dictionary meaning of "damage that impairs the structural integrity of the building," or it means the statutory definition in the 2011 amendments to Ch. 627.706, Florida Statutes, which went into effect on May 17, 2011.

According to Plaintiffs/Counterclaim Defendants, the term "structural damage" means "damage to the structure."

1. Retroactive Application

Whether a statutory change in the law should be applied retroactively is governed by state law.  Rivera v. Wal-Mart Stores East, LP, 2011 WL 7575393 at *2 (M.D. Fla. Jan. 13, 2011).  "The presumption against retroactive application is a well-established rule of statutory construction that is appropriate in the absence of an express statement of legislative intent because [it] will generally coincide with legislative and public expectations."  Florida Ins. Guar. Ass'n v. Devon Neighborhood Ass'n, Inc., 67 So.3d 187, 195 (Fla. 2011).  Where a change in the law is substantive, Florida law sets out a two-pronged inquiry to decide whether retroactive application is appropriate: "[1]...the Court must ascertain whether the Legislature intended for the statute to apply

Case No. 8:12-CV-1161-T-17MAP

retroactively....[2] if such an intent is clearly expressed, the Court must determine whether retroactive application would violate any constitutional principles." <u>Menendez v. Progressive Express Ins. Co., Inc.</u>, 35 So.3d 873, 877 (Fla. 2010).

In <u>Bay Farms Corporation v. Great American Alliance Insurance Co.</u>, 835 F.Supp.2d 1227 (M.D. Fla. 2011)(amendment substantive; constitutionally impermissible to impair vested rights), the Court held that the 2011 statutory amendment providing a definition of "structural damage" was not retroactively applicable.

2.  Substantive Change

A statutory change is substantive, and the presumption against retroactivity remains, when the new statute "accomplishes a remedial purpose by creating new substantive rights or imposing new legal burdens." <u>Metro Dade Cnty. v. Chase Fed. Hous. Corp.</u>, 737 So.2d 494, 500 (Fla. 1999).

First Liberty argues that the <u>Bay Farms</u> Court did not consider that at the time of the 2005 amendment which replaced the term "physical damage" with "structural damage" in the definition of sinkhole loss, the Florida Building Code defined the term "structural" as it applies to buildings to mean "any part, material or assembly of a building or structure which affects the safety of such building or structure and/or which supports any dead or designed live load and the removal of which part, material or assembly could cause, or be expected to cause, all or any portion to collapse or fail." First Liberty argues that the 2005 amendment substantively changed the definition of "sinkhole loss" and the 2011 amendments merely clarified the definition of "structural damage" added to Ch. 627.706 in 2005.

Case No. 8:12-CV-1161-T-17MAP

Plaintiffs/Counterclaim Defendants argues that the 2005 Amendment to Section 627.706 (b), "sinkhole loss," does not define "structural damage" and does not expressly incorporate the definition of "structural" in the Florida Building Code ("FBC").

a. Context of 2005 Amendment to Florida Statute 627.706

The 2005 Amendments to Sec. 627, inter alia, changed the definition of "sinkhole loss," explicitly provided that the statutory definition of "sinkhole loss" was the definition used in connection with insurance policies providing coverage for "sinkhole loss," changed the standards involved in investigating sinkhole claims, established testing standards by qualified professionals, established reporting requirements, and established a sinkhole database.

Florida Statute 627.706 (2003), Sinkhole insurance, effective from June 26, 2003 through May 31, 2005 provided:

> (1)    Every insurer authorized to transact property insurance in this state shall make available coverage for insurable sinkhole losses on any structure, including contents of personal property contained therein, to the extent provided in the form to which the sinkhole coverage attaches.
>
> (2)    "Loss" means structural damage to the building.  Contents coverage shall apply only if there is structural damage to the building.
>
> (3)    "Sinkhole loss" means actual physical damage to the property covered arising out of or caused by sudden settlement or collapse of the earth supporting such property only when such settlement or collapse results from subterranean voids created by the action of water on a limestone or similar rock formation.
>
> (4)    Every insurer authorized to transact property insurance in this state shall make a proper filing with the office for the purpose of extending the appropriate forms of property insurance to include coverage for insurable sinkhole losses.

Case No. 8:12-CV-1161-T-17MAP

<u>Florida</u> <u>Statute</u> 627.706 (2005), Sinkhole insurance; definitions, effective June 1, 2005 through September 30, 2006, provided:

(1)    Every insurer authorized to transact property insurance in this state shall make available coverage for insurable sinkhole losses on any structure, including contents of personal property contained therein, to the extent provided in the form to which the sinkhole coverage attaches.

(2)    As used in ss. 627.706-627.7074, and as used in connection with any policy providing coverage for sinkhole losses:

(a)    "Sinkhole" means a landform created by subsidence of soil, sediment, or rock as underlying strata are dissolved by groundwater.  A sinkhole may form by collapse into subterranean voids created by dissolution of limestone or dolostone or by subsidence as these strata are dissolved.

(b)    "Sinkhole loss" means structural damage to the building, including the foundation, caused by sinkhole activity.  Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity.

(c)    "Sinkhole activity" means settlement or systematic weakening of the earth supporting such property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on limestone or similar rock formation.

(d)    "Engineer" means a person, as defined in s. 471.005, who has a bachelor's degree or higher in engineering with a specialty in the geotechnical engineering field.  An engineer must have geotechnical experience and expertise in the identification of sinkhole activity as well as other potential causes of damage to the structure.

(e)    "Professional geologist" means a person, as defined by s. 492.102, who has a bachelor's degree or higher in geology or related earth science with expertise in the geology of Florida.  A professional geologist must have geological experience and expertise in the identification of sinkhole activity as well as other potential geologic causes of damage to the structure.

Case No. 8:12-CV-1161-T-17MAP

> (3)    Every insurer authorized to transact property insurance in this state shall make a proper filing with the office for the purpose of extending the appropriate forms of property insurance to include coverage for sinkhole losses.

Effective June 1, 2005, the Legislature amended sections 627.706 to 627.707, Florida Statutes (2005), and enacted sections 627.7065, 627.7072, and 627.7073 relating to database information, testing standards, and reporting requirements for sinkhole claims. Warfel v. Universal Ins. Co. of North America, 36 So.3d 136 (Fla. 2d DCA 2010)(statute establishing presumption of correctness for findings of insurer's engineer and geologist did not shift burden of proof to insured; reversing judgment in favor of insurer and remanding for new trial; certifying question as to effect of presumption to Florida Supreme Court). In Warfel, before a jury trial, the insurer, Universal, filed a motion asking the trial court to apply the referenced statutory provisions to the case, contending the 2005 amendments and enactments did not impair existing contract rights or obligations. In the alternative, Universal argued that any impairment was overidden by the State's interest in resolving a sinkhole insurance claim crisis. Universal also requested the trial court determine that section 90.304, Florida Statutes (2007) allowed a jury instruction based on section 627.7073(1)(c) as a rebuttable presumption affecting the burden of proof. The trial court denied Universal's motion as to sections 627.706 to 627.707, finding that the amendments were substantive and not applicable retroactively. The trial court granted Universal's motion as to sections 627.7065, 627.7972 and 627.7073, finding that those statutes were procedural and did not involve an issue of retroactivity, and granted Universal's motion as to the jury instruction. The Second District Court of Appeals found no error with the trial court's ruling finding that 627.7065, 627.7972 and 627.7073, sinkhole database, testing and reporting requirements, were procedural. Warfel at 137.

In Universal Ins. Co. v. Warfel, 82 So.3d 47 (Fla. 2012), the Florida Supreme Court approved the decision of the Second District Court of Appeals, and remanded,

13

Case No. 8:12-CV-1161-T-17MAP

holding that: 1) the sinkhole claim process statute does not apply in the litigation context; 2) the statute establishing a presumption of correctness for the findings of the engineer and geologist retained by an insurer in cases of alleged sinkhole loss affected the burden of producing evidence, such that the presumption would disappear upon the presentation of rebutting evidence, and 3) the jury instruction that the findings of the insurer's engineer and geologist were to be presumed correct was fundamental error. Because Warfel no longer challenged the trial court's finding that 627.7065, 627.7972 and 627.7073 were procedural, the Florida Supreme Court did not rule on that issue.

The Florida Supreme Court began by explaining the background of the presumption in the Florida Evidence Code, and the statutory scheme for sinkhole loss, from the enactment of section 627.706 in 1981 to 2005, noting that in 2005 the Legislature significantly restructured the sinkhole claim process:

> "In 2005, the Legislature significantly restructured the sinkhole claim process. Chapter 2005–111, Laws of Florida, amended sections 627.706 and 627.707, Florida Statutes (2005), and enacted sections 627.7065, 627.7072, and 627.7073, Florida Statutes (2005). Chapter 2005–111 basically reformed the claim process and the requirements for the investigation and reporting of claims for sinkhole damage that an insurer was required to satisfy before denying a claim of loss. Section 627.707, Florida Statutes, was amended, in part, to comply with the newly enacted sections 627.7072 and 627.7073. See ch. 2005–111, § 19, Laws of Fla. The former articulated testing standards for the claim process in connection with sinkhole claims and provided:
>
> (1) The engineer and professional geologist shall perform such tests as sufficient, in their professional opinion, to determine the presence or absence of sinkhole loss or other cause of damage within reasonable professional probability and for the engineer to make recommendations regarding necessary building stabilization, and foundation repair.
>
> (2) Testing by a professional geologist shall be conducted in compliance with the Florida Geological Survey Special Publication No. 57 (2005).
>
> Ch.2005–111, § 20, Laws of Fla. Section 627.7073, the statute at the

14

Case No. 8:12-CV-1161-T-17MAP

heart of this case, was enacted to govern the reports required during the claim process stemming from the tests required pursuant to section 627.7072. That statute provided:

(1) Upon completion of testing as provided in s. 627.7072, the engineer and professional geologist shall issue a report and certification to the insurer and the policyholder as provided in this section.

(a) Sinkhole loss is verified if, based upon tests performed in accordance with section 627.7072, an engineer and a professional geologist issue a written report and certification stating:

1. That the cause of the actual physical and structural damage is sinkhole activity within a reasonable professional probability.

2. That the analyses conducted were of sufficient scope to identify sinkhole activity as the cause of damage within a reasonable professional probability.

3. A description of the tests performed.

4. A recommendation by the engineer of methods for stabilizing the land and building and for making repairs to the foundation.

(b) If sinkhole activity is eliminated as the cause of damage to the structure, the engineer and professional geologist shall issue a written report and certification to the policyholder and the insurer stating:

1. That the cause of the damage is not sinkhole activity within a reasonable professional probability.

2. That the analyses and tests conducted were of sufficient scope to eliminate sinkhole activity as the cause of damage within a reasonable professional probability.

3. A statement of the cause of the damage within a reasonable professional probability.

4. A description of the tests performed.

(c) The respective findings, opinions, and recommendations of the engineer and professional geologist as to the verification or elimination of a sinkhole loss and the findings, opinions, and recommendations of the

Case No. 8:12-CV-1161-T-17MAP

engineer as to land and building stabilization and foundation repair shall
be presumed correct.

Ch.2005–111, § 21, Laws of Fla. The presumption created during the
claim process which is articulated in section 627.7073(1)(c) is the
presumption in question in this case.

Section 627.706 was amended to include definitions for "sinkhole,"
"sinkhole loss," "sinkhole activity," "engineer," and "professional geologist."
Ch.2005–111, § 17, Laws of Fla. Finally, the Legislature enacted section
627.7065 to create a "database of information relating to sinkholes."
Ch.2005–111, § 18, Laws of Fla. Subsection (1) of that provision provides:

The Legislature finds that there has been a dramatic increase in the
number of sinkholes and insurance claims for sinkhole damage in the
state during the past 10 years. Accordingly, the Legislature recognizes the
need to track current and past sinkhole activity and to make the
information available for prevention and remediation activities. The
Legislature further finds that the Florida Geological Survey of the
Department of Environmental Protection has created a partial database of
some sinkholes identified in Florida, although the database is not
reflective of all sinkholes or insurance claims for sinkhole damage. The
Legislature determines that creating a complete electronic database of
sinkhole activity serves an important purpose in protecting the public and
in studying property claims activities in the insurance industry."

Universal Insurance Co. v . Warfel, 82 So.3d 47, 54-58 (Fla. 2012).  The Florida
Supreme Court further observed:

Application of Chapter 627 to the Litigation Context

Preliminarily, we note that nothing in the sinkhole claim process statutory
scheme, as it appeared in 2005, applies that scheme in the litigation
context. The sinkhole statutes appear in chapter 627, titled "Insurance
Rates and Contracts," specifically in Part X, titled "Property Insurance
Contracts." That chapter was designed to provide a framework for
insurance companies to follow when encountering specific types of
claims, in this case claims involving sinkhole damage. The application of a

Case No. 8:12-CV-1161-T-17MAP

specific provision within that scheme to the evidentiary context is both misguided and inappropriate.

Nothing in section 627.7073, the statute in question here, justifies application of that statute to the litigation context. That section governs the claims process and the sinkhole reports that must be obtained by insurers and filed by the professional engineer or geologist employed by the insurer during the claim adjustment process to test for sinkhole damage. Section 627.7073(2), which immediately follows section 627.7073(1)(c), provides:

Any insurer that has paid a claim for a sinkhole loss shall file a copy of the report and certification, prepared pursuant to subsection (1), with the county property appraiser, who shall record the report and certification with the parcel number.  The insurer shall bear the cost of filing and recording the report and certification.  There shall be no cause of action or liability against an insurer for compliance with this section.  The seller of real property upon which a sinkhole claim has been made shall disclose to the buyer of such property that a claim has been paid and whether or not the full amount of the proceeds were used to repair the sinkhole damage.

§ 627.7073(2), Fla. Stat. (2006)...."

Universal Insurance Co., supra, at 57.

The Court has included the above citation only to show Florida Supreme Court's perception of Florida's statutory scheme for sinkhole losses in 2005.   That scheme protects the public by: 1)  requiring performance of scientific testing by qualified professionals during the claim adjustment process; 2) creation of a database for sinkhole claims, and 3) requiring filing and recording of sinkhole reports in connection with properties on which a claim has been paid, and disclosure of whether or not the amount of the claim proceeds were used to repair the sinkhole damage.   The Court also notes the trial court's determination that Florida Statute 627.706 and 627.707 (2005) could not be applied retroactively; that determination recognizes that the 2005 amendments to those sections involved a substantive change which impaired vested

Case No. 8:12-CV-1161-T-17MAP

rights.

Given that the 2005 amendment involved a substantive change, the Court must determine whether the term "structural damage" should be defined according to the meaning of "structural in the Florida Building Code. The Court looks first to the text of the relevant statute to determine legislative intent.  The 2005 amendment to Sec. 627.706 does not include a reference to Florida Building Code.  Where the language of that statute is clear and unambiguous, the Court should accord the statute its plain meaning; when the meaning of a statute is ambiguous, the Court turns to rules of statutory interpretation and construction.

In this case, both parties argue that the term within the statute "structural damage" should be given its ordinary and plain meaning.  In arguing that the meaning of "structural damage" is determined according the meaning of the term "structural" defined in the Florida Building Code (2005), Defendant/Counterclaim Plaintiff is asking the Court to find that "structural damage" is ambiguous and to construe Sec. 627.706(2)(b) in pari materia with the Florida Building Code ("FBC").

The Court finds that the term "structural damage" does have an ordinary and plain meaning.  Defendant/Counterclaim Plaintiff could have included a definition of "structural damage" within the policy, and could have spelled out Defendant/Counterclaim Plaintiff's intention only to afford coverage for sinkhole losses which cause a structure to fall down, or could be expected to cause a structure to fall down, but did not do so.   In the absence of a definition in the policy or applicable statute, other courts, and this Court, following rules of contract interpretation, have found the plain meaning of "structural damage" to be "damage to the structure."  See Zawadski v. Liberty Mutual Fire Ins. Co., 2012 WL 3656456 (M.D. Fla. 2012); Ayres v. USAA Cas. Ins. Co., 2012 WL 1094321 at *3-4 (M.D. Fla. 2012).

Case No. 8:12-CV-1161-T-17MAP

Defendant/Counterclaim Plaintiff argues that,  as a matter of statutory construction, the Court should find that "structural damage to the building" means something other than "damage to the structure."   In the 2005 Florida Statutes, in defining "engineer" and "professional geologist, " Section 627.706 (d), and (e) require expertise in the identification of sinkhole activity and "other potential causes of damage to the structure."   In Florida Statute 627.7072, the report must certify that the cause of "actual physical and structural damage" is sinkhole activity, within a reasonable professional probability."   After considering Florida Statute 627 as a whole, the Court concludes that the terms "structural damage," "damage to the structure" and "actual physical and structural damage" are used in a synonymous way.

If the Court assumes the term "structural damage" is ambiguous, while it is true that the FBC contained a definition of "structural" in 2005, it does not necessarily follow that the Florida Statutes regulating homeowner's insurance somehow incorporated that definition.  The primary purpose of the FBC is to effectively protect the safety and welfare of Florida citizens at the most reasonable cost to the consumer, and secondarily to protect property, as appropriate, by adopting and enforcing uniform minimum standards in building construction.  Florida Statute 553.2.  The Legislature emphasized that one vital way to protect Florida citizens is to require that all participants in the design and construction industries  maintain a thorough knowledge of the FBC and additions to the Code which improve construction standards to protect against storm and other damage.   Florida Statute 553.841.

Property insurance is insurance on real or personal property against loss or damage from any hazard or cause, and against consequential loss upon the loss or damage.  See Florida Statute 624.604.  The property owner pays  money to the insurer in exchange for the insurer's agreement to pay for loss or damage from contingent events which cause the losses.   There are construction standards which can protect against certain types of damage, such as hurricane and  windstorm damage.  Where

19

Case No. 8:12-CV-1161-T-17MAP

the property covered by a homeowner's policy incorporates features and techniques which reduce the risk of hurricane damage or windstorm damage, a premium discount may be available.  See Florida Statute 627.711, Notice of Premium Discounts for Hurricane Loss Mitigation, which became effective 10/1/2005.   The risk of exposure to sinkhole losses cannot be reduced in the same way; almost the entire State of Florida is at risk for sinkhole loss to some degree,  given the porous limestone or dolomite bedrock which underlies Florida.   The Legislature chose to include certain requirements within the Florida Statutes regulating homeowner's insurance which protect the citizens of Florida, the above-referenced scientific testing, database and reporting requirements, all of which are "after the fact" measures intended to assist in prevention and remediation, rather than the prophylactic measures which avoid or lessen storm damage to structures in the FBC.   The FBC and the Florida Statutes regulating property insurance for sinkhole losses are not about the same thing, where one is primarily concerned about public safety, and the other is concerned about the risk of economic loss to individual property owners.  On a general level, both statutes involve buildings, but that is not such a close relation that, if the term "structural damage" were determined to be ambiguous, the Court should construe that term according to the definition of structural in the Florida Building Code.

If in 2005 the Legislature did intend to limit the type or degree of damage to a home caused by sinkhole activity to only damage that could cause or be expected to cause the structure insured to fall down, which is a substantive change from "actual physical damage," without some evidence of that intent, or a clear expression of that intent, such as a reference in statute's language or legislative history, the Court cannot apply that interpretation of "structural" to this dispute.

b.  The 2007 Amendment to Florida Statute 627.706

In 2007, Florida Statute 627.706 provided:

20

Case No. 8:12-CV-1161-T-17MAP

**627.706. Sinkhole insurance; catastrophic ground cover collapse; definitions**

(1) Every insurer authorized to transact property insurance in this state shall provide coverage for a catastrophic ground cover collapse and shall make available, for an appropriate additional premium, coverage for sinkhole losses on any structure, including contents of personal property contained therein, to the extent provided in the form to which the coverage attaches. A policy for residential property insurance may include a deductible amount applicable to sinkhole losses equal to 1 percent, 2 percent, 5 percent, or 10 percent of the policy dwelling limits, with appropriate premium discounts offered with each deductible amount.

(2) As used in ss. 627.706-627.7074, and as used in connection with any policy providing coverage for a catastrophic ground cover collapse or for sinkhole losses:

(a) "Catastrophic ground cover collapse" means geological activity that results in all the following:

> 1. The abrupt collapse of the ground cover;
>
> 2. A depression in the ground cover clearly visible to the naked eye;
>
> 3. Structural damage to the building, including the foundation; and
>
> 4. The insured structure being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

Contents coverage applies if there is a loss resulting from a catastrophic ground cover collapse.   Structural damage consisting merely of the settling or cracking of a foundation, structure, or building does not constitute a loss resulting from a catastrophic ground cover collapse.

(b) "Sinkhole" means a landform created by subsidence of soil, sediment, or rock as underlying strata are dissolved by groundwater. A sinkhole may form by collapse into subterranean voids created by dissolution of

21

Case No. 8:12-CV-1161-T-17MAP

limestone or dolostone or by subsidence as these strata are dissolved.

(c) "Sinkhole loss" means structural damage to the building, including the foundation, caused by sinkhole activity. Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity.

(d) "Sinkhole activity" means settlement or systematic weakening of the earth supporting such property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

(e) "Professional engineer" means a person, as defined in s. 471.005, who has a bachelor's degree or higher in engineering with a specialty in the geotechnical engineering field. A professional engineer must have geotechnical experience and expertise in the identification of sinkhole activity as well as other potential causes of damage to the structure.

(f) "Professional geologist" means a person, as defined by s. 492.102, who has a bachelor's degree or higher in geology or related earth science with expertise in the geology of Florida. A professional geologist must have geological experience and expertise in the identification of sinkhole activity as well as other potential geologic causes of damage to the structure.

(3) On or before June 1, 2007, every insurer authorized to transact property insurance in this state shall make a proper filing with the office for the purpose of extending the appropriate forms of property insurance to include coverage for catastrophic ground cover collapse or for sinkhole losses. Coverage for catastrophic ground cover collapse may not go into effect until the effective date provided for in the filing approved by the office.

(4) Insurers offering policies that exclude coverage for sinkhole losses shall inform policyholders in bold type of not less than 14 points as follows: "YOUR POLICY PROVIDES COVERAGE FOR A CATASTROPHIC GROUND COVER COLLAPSE THAT RESULTS IN THE PROPERTY BEING CONDEMNED AND UNINHABITABLE. OTHERWISE, YOUR POLICY DOES NOT PROVIDE COVERAGE FOR SINKHOLE LOSSES. YOU MAY PURCHASE ADDITIONAL COVERAGE FOR SINKHOLE LOSSES FOR AN ADDITIONAL PREMIUM."

The 2007 amendment to Florida Statute 627.706 is a substantive change in that

Case No. 8:12-CV-1161-T-17MAP

coverage for catastrophic ground cover collapse is required to be made available, and coverage for sinkhole losses, aside from catastrophic ground cover collapse, is available as optional coverage, for a separate premium.

The definition of "sinkhole loss" in  Florida Statute 627.706(c) (2007) is unchanged from the 2005 amendment, Florida Statute 627.706(b)(2005).  The 2007 amendment  provides that "Structural damage consisting of settling or cracking of a foundation, structure or building does not constitute a loss resulting from a catastrophic ground cover collapse."  The Court understands this to mean that if geological activity results in all of the following: 1) abrupt collapse of ground cover, 2) a depression in the ground cover, 3) structural damage to the building, including the foundation, and 4) the insured structure is condemned and ordered vacated, there is coverage available for the structure and contents, but structural damage limited to settling or cracking of the foundation and structure is not a loss within the coverage afforded by catastrophic ground cover collapse.

Based on the language of the statute, the 2007 amendment does not limit the meaning of "structural damage"  According to the statute, "settling or cracking of the structure or foundation" is within the meaning of "structural damage."   The 2007 amendment indicates that structural damage which results in condemnation of the structure such that the structure is ordered vacated, assuming the other requirements are met, is within the coverage for catastrophic ground cover collapse, but structural damage limited to cracking and settling of the building and foundation is not within that coverage.  The 2007 amendment represents a legislative decision to provide coverage for structural damage which causes the structure to fall down, or be expected to fall down, when all statutory requirements are met.  Outside of catastrophic ground cover collapse, and premised on the payment of an additional premium, coverage for structural damage which is caused by sinkhole activity is available.

23

Case No. 8:12-CV-1161-T-17MAP

The Court has determined that the 2005 amendment did not incorporate the meaning of "structural" as defined in the Florida Building Code.  The 2005 amendment and the 2007 amendment did not define "structural damage."   After consideration,  the Court concludes as a matter of law that the 2011 amendment to Sec. 627.706(k) is a substantive change to the meaning of "structural damage."

3.  Intent to Apply Retroactively

The Court notes the analysis in <u>Bay Farms Corporation v. Great American Alliance Insurance Co.</u>, 835 F.Supp.2d 1227 (M.D. Fla. 2011), in which the Court determined that there was no clear, unambiguous intent to apply the 2011 amendment to Sec. 627.706 retroactively.  <u>See</u> <u>also</u> <u>Garcia v. First Liberty Ins. Corp.</u>, 2012 WL 3656456 at *2 (M.D. Fla. Oct. 29, 2012); <u>Zawadski v. Liberty Mutual Fire Ins. Co.</u>, 2012 WL 3656456 (M.D. Fla. 2012)

Defendant/Counterclaim Plaintiff has not identified clear evidence of intent that the 2011 amendment should apply retroactively in the language of the statute or its legislative history.

4.  Violation of Constitutional Principles

The 2011 amendments to Ch. 627.706, <u>Florida</u> <u>Statutes</u>, went into effect after the subject policy was issued.  Narrowing the scope of insurance coverage for sinkhole losses in a contract that predates the amending legislation violates Florida and federal constitutional principles.   "The Supreme Court of Florida has repeatedly recognized that 'subsequent legislation which diminishes the value of a contract is repugnant to [the Florida] Constitution."  <u>Bay Farms</u>, 835 F. Supp. At 1241 (citing <u>Dewberry v. Auto-Owners Ins. Co.</u>, 363 So.2d 1077, 1080 (Fla. 1978).

Case No. 8:12-CV-1161-T-17MAP

There is no evidence that the parties expected any changes to the definitions of "sinkhole loss" or structural damage" when they contracted for the policy, and there is no evidence that they agreed to be bound by subsequent changes in Florida law.  Since retroactive application of Sec. 627.706(k) would impair the value of the contract, Florida law forbids it.  Accordingly, it is

**ORDERED** that Defendant/Counterclaim Plaintiff's Motion for Summary Judgment (Dkt. 29) on its Counterclaim for Declaratory Judgment is **denied**.

**DONE and ORDERED** in Chambers, in Tampa, Florida on this 6th day of September, 2013.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record